[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10946

_____

D.C. Docket No. 6:14-cr-00217-GAP-DAB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

THOMAS S. JACKSON,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 12, 2017)

Before TJOFLAT, HULL and O'MALLEY,[*] Circuit Judges.

HULL, Circuit Judge:

_____

[*]Honorable Kathleen M. O'Malley, United States Circuit Judge for the Federal Circuit, sitting by designation.

From 1997 until May 2010, Defendant Thomas Jackson served as the Chief of Police of the Longwood Police Department (the "LPD") in Longwood, Florida. As Chief, Jackson was the official ultimately responsible for deciding who to hire as an LPD police officer. During his tenure as Chief, Jackson took payments from Samer Majzoub and, in exchange, appointed Majzoub as a Florida law enforcement officer by swearing Majzoub in and giving Majzoub official LPD police credentials. A jury convicted Jackson of one count of conspiracy, in violation of 18 U.S.C. § 371, and three counts of bribery of an agent of a local government receiving federal funds ("federal funds bribery"), in violation of 18 U.S.C. § 666(a)(1)(B).[1] After review, and with the benefit of oral argument, we affirm Jackson's convictions.

## I.    FACTUAL BACKGROUND

Although we do not know when Defendant Jackson and Majzoub met, their involvement dates back to at least March 2006. At that time, Chief Jackson provided Majzoub with credentials—a badge and photo identification—indicating that Majzoub was an "officer" and "a duly appointed member of the Longwood

---

[1]The three crimes charged as the objects of the conspiracy were federal funds bribery under § 666(a)(1)(B), possession of a firearm by a felon under 18 U.S.C. § 922(g)(1), and honest services fraud under 18 U.S.C. §§ 1343 and 1346.

Police Department." Previously, Majzoub had been convicted of felony mail fraud but received a pardon from the Florida governor.[2]

## A.    Jackson and Majzoub Work on Counterterrorism Training

In 2007, the Florida Attorney General's office began an effort to develop counterterrorism training to teach local law enforcement how to identify possible extremists and prevent terrorism. Both Defendant Jackson and Majzoub were involved in that effort. As part of this work, Majzoub received special deputy identification, but this designation did not make him a sworn officer or allow him to carry a gun. From the beginning of his involvement, Majzoub was upfront about his criminal history with the Florida Attorney General.

## B.    Jackson Helps Majzoub with Becoming a Law Enforcement Officer

Around October 2007, Defendant Jackson brought Majzoub to meet Curtis Hague, then the criminal justice director at a local police academy. They inquired about what Majzoub would need to do to attend the police academy. Chief Jackson and Majzoub told Director Hague about Majzoub's federal conviction and gubernatorial pardon. In light of this information, Hague called the Florida Department of Law Enforcement (the "FDLE") for guidance. The FDLE provides staff for the Criminal Justice Standards and Training Commission (the

---

[2]In 1993, Majzoub pled guilty to one count of securities and mail fraud, and in 1996 a federal district court sentenced Majzoub to a prison term of time served and three years of supervised release. In this separate criminal case, Majzoub was indicted as a co-defendant with Defendant Jackson, but Majzoub remains a fugitive and has not been tried.

"Commission"), which is a 19-member body of law enforcement officials that oversees the certification of, and disciplinary actions against, criminal justice officers in Florida, including law enforcement officers, correctional officers, and correctional probation officers. See Fla. Stat. §§ 943.11-943.13. The Commission's certification is required to serve as a Florida law enforcement officer. See Fla. Stat. §§ 943.12(3), 943.1395(1).

As a result of his conversation with one of the FDLE's attorneys, Director Hague allowed Majzoub to apply to the police academy. On October 4, 2007, Majzoub wrote Defendant Jackson a $3,700 check.

Majzoub attended the police academy, completed all of the coursework, including 40 hours of firearms training, and graduated. Majzoub subsequently passed the state certification exam for law enforcement officers.

Meanwhile, the work on the counterterrorism training continued. On March 26, 2008, Defendant Jackson wrote to the Florida Attorney General discussing his coordination of the counterterrorism training with Majzoub. The next day, Majzoub wrote Jackson a $6,200 check.

Defendant Jackson and Majzoub continued to pursue Majzoub's goal of becoming a full-fledged police officer. On June 3, 2009, Majzoub's attorney sent Jackson a letter stating that Majzoub "sincerely appreciates your decision to swear him in to serve as" an LPD law enforcement officer. The letter assured Jackson

4

that, under federal law, Majzoub was legally entitled to possess a firearm for official use as a law enforcement officer despite his felony conviction.

On July 10, 2009, LPD Commander Troy Hickson, acting on Defendant Jackson's instruction, put Majzoub through the firearms qualification required to be hired and sworn in as an LPD officer. That same day, Chief Jackson swore in Majzoub as a law enforcement officer. They filled out an "Oath of Office" form for Majzoub. This form stated that Majzoub was "being employed by or an officer of" the LPD. Jackson's assistant notarized the "Oath of Office" form. Majzoub signed a "Mission" statement and a "Code of Ethics" for law enforcement officers, in which he acknowledge various duties and obligations of law enforcement officers.

Defendant Jackson asked then Detective Ryan Bruce to do a background investigation on Majzoub as part of Majzoub's employment application process. Detective Bruce contacted FDLE agent Kathy Myers to discuss Majzoub's conviction and gubernatorial pardon. After talking to Myers, Bruce updated Chief Jackson on the situation, including the fact that the gubernatorial pardon may be insufficient. The next day, Myers contacted Bruce and informed him that the FDLE had decided that Majzoub could not be certified because Majzoub's pardon did not restore his right to possess a firearm. Bruce conveyed this information to Jackson.

5

Subsequently, Myers discussed Majzoub's eligibility with Defendant Jackson. Myers informed Chief Jackson that Majzoub was not eligible for certification as a law enforcement officer even with the gubernatorial pardon. Myers forwarded the issue to the FDLE's legal counsel so that someone else could review it.

On August 14, 2009, Defendant Jackson sent Myers a letter on LPD letterhead that was prepared by Majzoub's attorney asking the Commission to consider Majzoub's eligibility to serve as a Florida law enforcement officer. Myers received Chief Jackson's letter, along with some related documents, and understood the letter to ask that the Commission itself certify Majzoub because Myers and the FDLE staff were not "going to sign off on his certification." Myers, however, also told other FDLE staff that she did not consider the letter and attached documents to constitute an application for certification and that, if it was a formal application, the package of documents would be missing two required affidavits.

Defendant Jackson and Myers continued to communicate about Majzoub's eligibility, and Myers requested additional documentation, which Jackson provided, including a copy of the judgment from Majzoub's criminal case. On September 3, 2009, Majzoub wrote Defendant Jackson a $5,500 check.

6

On September 24, 2009, Defendant Jackson emailed Majzoub, telling him about an official notice from the Commission that the Commission would, at its October 29, 2009 meeting, review Majzoub's eligibility for certification as a law enforcement officer. The next day, September 25, 2009, Jackson deposited a $5,500 check from Majzoub into his bank account.[3]

On October 21, 2009, Defendant Jackson sent another letter to the Commission, prepared by Majzoub's attorney, withdrawing his request for the Commission to consider Majzoub's eligibility. The Commission did not consider Majzoub's eligibility at that time.

Despite being unable to get certification as a Florida police officer, Majzoub remained undeterred from accomplishing his goal and applied for a police officer position with the Washington, D.C. Metro Police. On October 28, 2009, Defendant Jackson sent a recommendation letter to Chief Louis Cannon of the D.C. Metro Police recommending "Commander Sam Majzoub" for employment as a police officer. Chief Jackson's letter attached Majzoub's "recent firearms qualification." The firearms qualification form was signed "Commander T. Hixon." The actual Commander Hickson testified that he did not fill out the form, that his name was misspelled, and that it was a forgery.

---

[3]The check itself was dated September 28, but Defendant Jackson's bank account records show a $5,500 deposit on September 25.

7

**C.     Jackson Attempts to Buy a North Carolina Property**

On December 7, 2009, Defendant Jackson emailed Majzoub about an "investment," specifically a North Carolina property for which Jackson had offered $200,000 to purchase.  Jackson explained to Majzoub that he intended to use his retirement package to purchase the property in cash but could not withdraw enough money until April 1, 2010.  Jackson then asked Majzoub if he would "be interested in investing $100,000" at a five percent return.

On December 16, 2009, Defendant Jackson made a series of financial transactions in order to pay $4,500 to Mary Bickness, the seller of the North Carolina property.  Jackson deposited $4,500 in cash into his bank account ending in 7360.  Jackson wrote a $4,500 check from the 7360 account to BB&T for a "cashiers check."  BB&T issued a $4,500 cashier's check payable to Bickness with Jackson listed as the remitter.

During January 2010, Defendant Jackson had his assistant "rush order" a box of LPD business cards for Majzoub, which identified Majzoub as "Commander" and "Director of Counterterrorism Training" for the LPD.

On February 13, 2010, Defendant Jackson informed Majzoub that he had reached an agreement with Bickness but needed to pay an additional $5,000 up front.  On February 16, 2010, Majzoub requested from Wachovia a $5,000 official bank check payable to Bickness for Jackson "to pick up."  Wachovia issued the

8

check, and Bickness deposited $5,000 into her bank account two days later on February 18, 2010.

On April 13, 2010, Defendant Jackson informed Majzoub that the deal for the North Carolina property fell through and that "$10,000 was forfeited" in the process.

May 28, 2010 was Defendant Jackson's last day as Chief, and on that day Majzoub gave him $6,200. On June 1, 2010, Jackson used this money to purchase an official bank check for $6,200 made payable to Bickness.

**D.    Jackson's Bank Records**

Defendant Jackson's 2007 to 2014 bank records showed that, at the beginning of 2007, 2008, and 2009, he had a negative balance between his bank accounts. In 2010, Jackson began the year with a total balance of $371. The bank records demonstrated six payments from Majzoub to Jackson that were cashed, deposited, or converted into official bank checks to Bickness. Neither Jackson's nor Majzoub's bank records indicated that any money went from Jackson back to Majzoub.

In sum, Majzoub made six payments to Defendant Jackson. The last two were related to the purchase of the North Carolina property, and it is unclear how the money from the other four payments was used.

9

### E.    Financial Interests Forms

The Seminole County Supervisor of Elections maintains Statement of Financial Interests Forms for public disclosure of income by persons in public positions.  The Statement of Financial Interests Form directs the public official to disclose primary and secondary sources of income, investment real estate, intangible personal property such as stocks and bonds, liabilities, and ownership interests or positions in certain types of businesses.  For liabilities, debts over $10,000, other than credit card debts, must be reported.  As Chief, Defendant Jackson was required to fill out these forms, which he did.  For 2007 through 2009, Chief Jackson never reported any income from Majzoub or any liabilities owed to Majzoub.

### F.    Search of Majzoub's Home

In July and September 2014, federal agents raided Majzoub's home in Lake Mary, Florida.  Majzoub had numerous police badges and identification cards from various law enforcement agencies.  Three LPD star badges read "Longwood Police."  Eight LPD photo identification cards read "Commander," "Police Officer," "Officer," and "Lieutenant."

The front of several of the LPD photo identification cards described Majzoub as "a duly appointed member of the Longwood Police Department."  Two other identification cards stated that "Lieutenant" Majzoub "is a duly appointed

10

Police Officer and is empowered to execute all duties of the office as prescribed by F.S.S. 943.10."[4]  Only one of the eight identification cards had had the term "Honorary Member" on it.  None of the three police star badges used the term "honorary."

## II.    PROCEDURAL HISTORY

On September 17, 2014, a grand jury indicted Defendant Jackson for conspiracy to solicit and obtain bribes in return for appointing Majzoub as an LPD officer (Count One) and federal funds bribery (Counts Two through Four).  Even though the trial evidence reflected six payments from Majzoub to Jackson, the indictment only charged Jackson with accepting bribes for three of those payments, specifically the payments occurring on September 28, 2009, February 16, 2010, and May 28, 2010.

---

[4]That Florida statute defines the term "law enforcement officer" for purposes of the proceeding statutory provisions, as follows:

"Law enforcement officer" means any person who is elected, appointed, or employed full time by any municipality or the state or any political subdivision thereof; who is vested with authority to bear arms and make arrests; and whose primary responsibility is the prevention and detection of crime or the enforcement of the penal, criminal, traffic, or highway laws of the state. This definition includes all certified supervisory and command personnel whose duties include, in whole or in part, the supervision, training, guidance, and management responsibilities of full-time law enforcement officers, part-time law enforcement officers, or auxiliary law enforcement officers but does not include support personnel employed by the employing agency.

Fla. Stat. § 943.10(1).

After a seven-day trial, the jury found Defendant Jackson guilty on all four counts. Jackson filed a post-trial motion for judgment of acquittal, or alternatively for new trial, which the district court denied. The district court sentenced Jackson to 48 months in prison.

## III.    DISCUSSION

On appeal, Defendant Jackson raises four alleged errors by the district court: (1) denying the motion for judgment of acquittal based on the sufficiency of the evidence, (2) declining to give a requested jury instruction, (3) refusing to allow him to question FDLE attorneys, and (4) denying the motion to dismiss the indictment.

## A.    Sufficiency of the Evidence for § 666(a)(1)(B) Federal Funds Bribery

We begin with the sufficiency of the evidence supporting Defendant Jackson's bribery convictions.[5] The federal funds bribery statute under which Jackson was charged and convicted (Counts Two through Four) provides for the imprisonment of an agent of a local government who:

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

---

[5]We review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict. United States v. Green, 818 F.3d 1258, 1274 (11th Cir. 2016). We will affirm the district court's denial of a motion for judgment of acquittal if a reasonable trier of fact could conclude the evidence proved the defendant's guilt beyond a reasonable doubt. Id.

12

18 U.S.C. § 666(a)(1)(B).[6]  In other words, Jackson "violated § 666(a)(1)(B) if: (1) [he] solicited or accepted anything of value; (2) with the corrupt intent to be influenced or rewarded; (3) in connection with any business, transaction, or series of transactions of [the City of Longwood] involving anything of value of $5,000 or more."  United States v. McNair, 605 F.3d 1152, 1185 (11th Cir. 2010).[7]

Under § 666(a)(1)(B), "[i]t is acting 'corruptly'—dishonestly seeking an illegal goal or a legal goal illegally—that separates permissible from criminal."  Id. at 1188.  Based on the statutory language, this Court has summarized the requisite "corrupt intent" in § 666(a)(1)(B) as "the 'corrupt intent' to be influenced or rewarded."  United States v. White, 663 F.3d 1207, 1213 (11th Cir. 2011); see also United States v. US Infrastructure, Inc., 576 F.3d 1195, 1204 (11th Cir. 2009) (finding that "[t]o sustain the bribery convictions, the government must prove that appellants paid . . . with the corrupt intent to influence or reward"); § 666(a)(2) (setting out the elements of federal funds bribery relevant to giving a bribe "with intent to influence or reward").

---

[6]"A predicate to a § 666 offense is that the defendant must be an agent of an 'organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.'"  United States v. McNair, 605 F.3d 1152, 1185 n. 36 (11th Cir. 2010) (quoting 18 U.S.C. § 666(b)).  Here it is undisputed that Defendant Jackson was an employee, and thus an agent, of the City of Longwood and that the City of Longwood received the requisite amount of federal funds.

[7]While the $5,000 amount refers to the value of the "business, transaction, or series of transactions," "some courts have used the bribe amount as a proxy to stand for the value of the business or transaction."  McNair, 605 F.3d at 1185 n.38.

Among other things, the indictment alleged that Defendant Jackson received three bribes in exchange for appointing Majzoub as an LPD law enforcement officer. Viewed in the light most favorable to the verdict, the evidence at trial demonstrated exactly that.

The trial evidence strongly supports the conclusion that Defendant Jackson corruptly received bribes while serving as the LPD police chief. Jackson accepted "anything of value" in the form of six separate payments from Majzoub. These payments rewarded or influenced Jackson to use his authority as Chief to appoint Majzoub as a law enforcement officer, a "transaction" of the LPD. Specifically, Chief Jackson provided Majzoub with official LPD credentials, including "Longwood Police" badges and photo identification cards labeling Majzoub a "duly appointed" officer of the LPD with the power to execute all the duties of the position. These official LPD credentials gave Majzoub all the indicia of a lawfully appointed Florida law enforcement officer. These credentials reflect not only that Jackson appointed Majzoub, but also that Jackson later promoted Majzoub, giving him the titles of "Police Officer," "Sergeant," "Lieutenant," and "Commander." In addition, Jackson made Majzoub the "Director of Counterterrorism Training" for the LPD. Jackson also swore in Majzoub as a Florida law enforcement officer.

Under Florida law, the Commission's certification is required to serve as a law enforcement officer. It is undisputed that Majzoub never obtained the

14

Commission's certification.  Viewing the evidence in the light most favorable to the jury's verdict, Chief Jackson therefore appointed (and held out) Majzoub as a duly appointed LPD law enforcement officer even though the Commission had yet not certified Majzoub and  Majzoub could not legally serve as a law enforcement officer without that certification.  See Fla. Stat. §§ 943.12(3), 943.1395(1).  The evidence supports the jury's finding that Jackson acted with a corrupt intent.  He sought to appoint Majzoub as a police officer in exchange for bribes and sought that goal using illegal means—appointing Majzoub and giving him credentials without the Commission's certification.

Defendant Jackson's continued efforts to advance Majzoub's career demonstrate his corrupt intent.  Chief Jackson gave Majzoub official LPD credentials even before Majzoub had attended the police academy.  Jackson later helped Majzoub get into the police academy.  In one instance, Jackson wrote a letter to Florida's Attorney General supporting Majzoub's work with the counterterrorism training program and received $6,200 from Majzoub the very next day.  Jackson acted on Majzoub's behalf to get Majzoub into the police academy and to obtain the Commission's certification.  Jackson even used a forged firearms qualification to support his recommendation of "Commander" Majzoub for a law enforcement officer position to another police chief.  The firearms

15

qualification had the forged and misspelled signature of one of Jackson's deputies, Commander Hickson.

Thus, under § 666(a)(1)(B), Defendant Jackson "corruptly" accepted "anything of value" (money from Majzoub) with the intent to be influenced or rewarded (in exchange for illegally making Majzoub a police officer) in connection with any business or transaction of the City of Longwood (appointing Majzoub as a police officer and bestowing upon Majzoub all the indicia of a lawfully appointed law enforcement officer). McNair, 605 F.3d at 1185.

The evidence also supplied a clear motive for why Defendant Jackson, as Chief, appointed Majzoub in exchange for bribes. Jackson's bank records demonstrate that, for years, he was often woefully short on cash. Then, as his retirement as Chief approached, Jackson wanted to purchase a retirement property in the North Carolina woods but did not have the cash needed to pay Bickness, the property's seller. Jackson turned to Majzoub for financial assistance.

It was at that time, while Majzoub was bankrolling Jackson's attempt to purchase the North Carolina property, that Jackson ordered LPD business cards for Majzoub. These LPD business cards named Majzoub "Commander" and "Director of Counterterrorism Training" of the LPD, giving Majzoub a promotion from his titles of "Sergeant" and "Lieutenant." Majzoub's payments continued right up

16

until Jackson's last day as Chief of Police, and Jackson used that last check to pay Bickness.

Viewing the evidence in the light most favorable to the government and the jury's verdict, we conclude that the evidence was sufficient to sustain Defendant Jackson's convictions for three counts of federal funds bribery in violation of § 666(a)(1)(B).

Moreover, the fact that certain of Majzoub's payments came after Defendant Jackson provided Majzoub credentials and performed the swearing-in is largely immaterial. Instead, under § 666(a)(1)(B), the bribe can be corruptly solicited with the intent "to be influenced or rewarded" in connection with any business, transaction, or series of transactions. McNair, 605 F.3d at 1186 (emphasis added). A "reward" can come after the business or transaction occurred so long as the defendant intended to be rewarded for his conduct in that transaction. See United States v. Bonito, 57 F.3d 167, 171 (2d Cir. 1995) (concluding that § 666 "cover[s] payments made with intent to reward past official conduct, so long as the intent to reward is corrupt"). Therefore, the dates of the payments are of no moment because the jury reasonably could have found the bribes were rewards to Jackson for appointing Majzoub as a police officer and then promoting him to three higher offices during 2009 and 2010.

Here, the evidence shows that in several instances a payment from Majzoub occurred close in time to when Jackson took some action favorable to Majzoub. For example, Jackson sent the Florida Attorney General a communication regarding Majzoub's counterterrorism training and received a check the next day. More importantly, the series of payments from Majzoub and favors from Jackson demonstrate an ongoing relationship in which Jackson made Majzoub a police officer and provided him with updated credentials, including promotions, while Majzoub continued to give Jackson money.

Admittedly, at least one other circuit has distinguished a gratuity for a past act from a bribe. See United States v. Fernandez, 722 F.3d 1, 19 (1st Cir. 2013) ("Therefore, if the agreement to exchange a thing of value for an act is made after that act has been performed, that agreement cannot be properly viewed as an agreement to offer or accept a bribe."). In reaching this decision, the First Circuit relied on the Supreme Court decision, United States v. Sun-Diamond Growers of California, 526 U.S. 398, 119 S. Ct. 1402 (1999), which interpreted 18 U.S.C. § 201(c)(1)(A), a different criminal bribery statute than § 666. See 722 F.3d at 19. In McNair, this Court concluded that the holding in Sun-Diamond does not apply to § 666(a)(1)(B). 605 F.3d at 1190-91. Accordingly, Sun-Diamond's reasoning should not be used here to conclude that § 666(a)(1)(B) does not cover a payment for a past act.

18

The statutory language of § 666(a)(1)(B) supports that conclusion. Unlike § 201(c)(1)(A), § 666(a)(1)(B) covers instances where the intent is to be influenced or rewarded. A reward would implicitly come after the act—a transaction of the organization—has been completed. Section 666(a)(1)(B) thus covers Majzoub's payments to Defendant Jackson that rewarded Jackson for something he had already done.

Defendant Jackson argues the indictment only refers to his "appointment" of Majzoub and thus that the government's other evidence related to the Commission's certification process and the letter of recommendation cannot form the basis of his bribery convictions. The indictment says that Jackson accepted payments from Majzoub that were intended to influence and reward Jackson in the "appointment" of Majzoub as an LPD law enforcement officer. As discussed above, Jackson did appoint Majzoub and bestowed upon him all the indicia of a lawfully appointed law enforcement officer. There was thus sufficient evidence to support Jackson's conviction and no variance from the indictment.

The other evidence showing that Defendant Jackson worked to obtain the Commission's certification for Majzoub merely demonstrates Jackson's intent to continually aid Majzoub in exchange for money. Even if there was some variance between the indictment and the proof at trial, Jackson has made no attempt to demonstrate that the variance is material or substantially prejudicial, and we will

19

thus not reverse his conviction.  United States v. Holt, 777 F.3d 1234, 1263 (11th Cir. 2015) ("[U]nless a variance is material and substantially prejudiced the defendants, we will not reverse the defendants' convictions.").

As a last-ditch effort, Defendant Jackson asks us to "reconsider" our holding in McNair that § 666(a)(1)(B) does not require an "official act" or a "quid pro quo."  This we cannot do.  See United States v. Sneed, 600 F.3d 1326, 1332 (11th Cir. 2010) ("Under [our prior panel precedent] rule, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc."); see also McNair, 605 F.3d at 1190-91 (explaining that § 666 does not contain the same "official act" language found in § 201 as part of its reasoning for holding that § 666 does not require a quid pro quo).[8]

---

[8]This case does not present an opportunity for us to evaluate the effect of McDonnell v. United States, 579 U.S. ___, 136 S. Ct. 2355 (2016) (defining the term "official act" in 18 U.S.C. § 201(a)(3)) on § 666(a)(1)(B) or on our precedent in McNair.  Defendant Jackson did not challenge the jury charge describing the elements of a § 666(a)(1)(B) crime on this ground either before the district court or in his opening brief on appeal.  Jackson thus waived this issue by failing to raise it until his reply brief on appeal.  See United States v. Durham, 795 F.3d 1329, 1330 (11th Cir. 2015) (en banc) (reiterating this Circuit's "longstanding" rule "that an appellant who does not raise an issue in his opening brief may not do so in his reply brief").  Instead, Jackson challenged only the sufficiency of the evidence to sustain his conviction for the crime.

We recognize that the Supreme Court issued its decision in McDonnell two days before the due date for Jackson's opening appellate brief.  This Court's precedent makes clear, however, that the challenge to the jury instruction on "official act" raised in McDonnell was available to Jackson to make in his opening brief given that the Supreme Court granted certiorari on the issue five months before Jackson filed his brief and the Fourth Circuit had already ruled on the issue. See McDonnell v. United States, 136 S. Ct. 891 (2016) (granting certiorari); United States v. McDonnell, 792 F.3d 478 (4th Cir. 2015) (affirming McDonnell's convictions); see also McGinnis v. Ingram Equip. Co., 918 F.2d 1491, 1496 (11th Cir. 1990) (en banc) (explaining that

20

**B.     Sufficiency of the Evidence to Establish a Covered Act**

In any event, ample evidence demonstrated that Defendant Jackson did perform the type of act covered by § 666(a)(1)(B): he appointed Majzoub as an LPD law enforcement officer.  Chief Jackson provided Majzoub with LPD badges credentials, performed a swearing-in ceremony, and administered the oath of office.  Jackson even had his assistant rush order LPD business cards for Majzoub that identified Majzoub as "Commander" and "Director of Counterterrorism Training" for the LPD.  Jackson thus did much more than set up meetings, make connections, or advocate for Majzoub: Jackson used his position as Chief to make Majzoub a police officer.  This evidence was sufficient to show Jackson committed a covered act in exchange for bribes and to sustain his convictions for federal funds bribery.[9]

---

even without a Supreme Court decision an argument is available when other defendants have raised it, another circuit has ruled on it, and the Supreme Court has granted certiorari on it); United States v. Levy, 379 F.3d 1241, 1243 n.3 (11th Cir. 2004) (same).

[9]This case is materially different from the posture in McDonnell.  First, in McDonnell the district court's jury instructions defined "official act" as including "acts that a public official customarily performs" and "acts 'in furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'"  McDonnell, 579 U.S. at ___, 136 S. Ct. at 2366.  No such charge was given here.  Second, the defendant in McDonnell requested that the district court further charge the jury "that 'merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, "official acts," even if they are settled practices of the official,' because they 'are not decisions on matters pending before the government.'"  Id.  The district court refused to give that charge.  Id.  Third, the defendant in McDonnell argued "that his convictions must be vacated because the jury was improperly instructed on the meaning of 'official act' under § 201(a)(3) of the federal bribery statute."  Id. at ___, 136 S. Ct. at 2373.  Fourth, the Supreme Court vacated the defendant's convictions,

## C.   Sufficiency of the Evidence for the Conspiracy

The evidence was also sufficient to sustain Defendant Jackson's conspiracy conviction.  Although we could find that Jackson abandoned this argument, we will address it for the sake of completeness.

To prove conspiracy, the government had to establish: (1) the existence of an agreement to commit either federal funds bribery, possession of a firearm by a felon, or honest services fraud, (2) knowing and voluntary participation in the conspiracy, and (3) an overt act in furtherance of the conspiracy.  See White, 663 F.3d at 1214.

As explained above, the jury had sufficient evidence to find Defendant Jackson guilty of federal funds bribery.  The payments themselves, as well as the emails about the North Carolina property, establish the existence of an agreement. Jackson's need for cash provides evidence of his motive to participate in the conspiracy.  Jackson's continued assistance to Majzoub, along with the emails,

---

concluding "the jury was not correctly instructed on the meaning of 'official act.'"  Id. at ___, 136 S. Ct. at 2375.

Here, given that § 666(a)(1)(B) does not use the term "official act," there was no objection to the actual jury charge about the elements of a § 666(a)(1)(B) offense, much less a request for a specific definition of "official act."  Furthermore, Defendant Jackson did not argue that the jury was improperly instructed as to the meaning of an official act, or as to any other element of a § 666(a)(1)(B) offense.  We thus examine only the sufficiency of the evidence to support Jackson's convictions on any ground and not whether the jury was properly charged as to § 666(a)(1)(B).

22

shows that he acted knowingly and voluntarily. Jackson swearing in Majzoub and giving him official LPD credentials suffices for an overt act.

As another example, Defendant Jackson ordered Commander Hickson, his subordinate, to take Majzoub to the firing range for the firearms qualification, despite Majzoub's felony conviction. Majzoub went, possessed, and presumably used a firearm at that time. This evidence shows Jackson's agreement, voluntary participation, and an overt act in furtherance of the felon-in-possession conspiracy. The jury could reasonably have rejected Jackson's good faith defense—that the official use exception to possession of a firearm by a felon allowed Majzoub to possess (and use) a firearm. At that time, Jackson knew that the Commission had not certified Majzoub to serve as a law enforcement officer in Florida and that Majzoub had not been authorized to carry a firearm in connection with his official duties because Majzoub had no official duties. The jury therefore had sufficient evidence to convict Jackson on the conspiracy count.

### D.    Jury Instructions

Defendant Jackson contends that he lacked corrupt intent because Majzoub was not categorically prohibited from becoming a certified Florida police officer despite his federal felony conviction. Jackson thus argues that he and Majzoub did not seek an illegal end. A Florida statute requires a law enforcement officer to "[n]ot have been convicted of any felony." Fla. Stat. § 943.13(4). Jackson sought

23

to have the district court instruct the jury about Florida case law which suggested

that Majzoub's felony conviction was not an absolute bar to him becoming a police

officer in spite of § 943.13(4).

That Florida case law is a Florida Supreme Court opinion, Sandlin v.

Criminal Justice Standards & Training Commission, 531 So. 2d 1344 (Fla. 1988).

Sandlin answered the following Florida-law question about certifying a convicted

felon with a full pardon as a law enforcement officer:

> Does a full pardon under chapter 940, Florida Statutes (1985), which restores the civil rights of a person convicted of a felony, relieve the pardoned person from the disqualification from certification as a law enforcement officer imposed by section 943.13(4), Florida Statutes (1985), on a person who has been convicted of any felony?

Sandlin, 531 So. 2d at 1344–45.  The Florida Supreme Court answered the

question in the affirmative, concluding that the Commission had the discretion to

certify a person with a felony conviction and full gubernatorial pardon "for

appointment as a law enforcement officer, but may refuse to do so if it deems him

to be of bad character, a poor moral risk, or an otherwise unfit appointee." Id. at

1347.  Relying on Sandlin, a Florida appellate court has found that a different

licensing statute did not per se bar licensing a person with a federal felony

conviction whose civil rights, except for the right to possess a firearm, the Florida

governor restored.  See Kauk v. Dep't of Fin. Servs., 131 So. 3d 805, 808-09 (Fla.

Dist. Ct. App. 2014).

Defendant Jackson asked the district court to instruct the jury on <u>Sandlin</u>, which the district court did not do.  The district court decided that the Florida case law was "irrelevant" and that instructing the jury on it "would just add confusion."

This Court will reverse a district court's refusal to give a requested jury instruction only "if (1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense."  <u>United States v. Drury</u>, 396 F.3d 1303, 1318 (11th Cir. 2005) (internal quotation marks omitted).  This Court examines the jury charge as a whole, determining whether the entire charge sufficiently instructed the jury about the issues.  <u>Id.</u>[10]

Before turning to Defendant Jackson's requested jury instruction, we review the jury charge given by the district court.  The district court first summarized the conspiracy charge: "Count 1 charges that the defendant knowingly and willfully conspired to: One, commit bribery of a government official; two, possession of a firearm by a convicted felon; and three, honest services fraud."

The district court then summarized the three substantive charges of "bribery of an agent of a local government receiving federal funds in violation of 18 United States Code Section 666(a)(1)(B)":

---

[10]We review the district court's refusal to give a defendant's requested jury instruction for abuse of discretion.  <u>United States v. Chirinos</u>, 112 F.3d 1089, 1101 (11th Cir. 1997).

25

It's a federal crime for anyone who is an agent of an organization receiving significant benefits under a federal assistance program to corruptly solicit or demand or accept or agree to accept anything of value from any person when the agent intends to be influenced or rewarded in connection with certain transactions of the government or agency.

Next, the district court set forth the elements of that crime, which the government must prove beyond a reasonable doubt:

1. The defendant was an agent of the City of Longwood and the Longwood Police Department.

2. The City of Longwood and the Longwood Police Department were government agencies during the years 2007 through and including 2011.

3. The City of Longwood and the Longwood Police Department received in each of those years benefits greater than $10,000 under a federal program involving some form of federal assistance.

4. The defendant solicited or demanded or accepted or agreed to accept anything of value from someone other than the City and the Longwood Police Department.

5. In return for the acceptance or agreement, the defendant intended to be influenced or rewarded for a transaction or series of transactions with the City of Longwood and the Longwood Police Department involving something worth $5,000 or more.

6. That the defendant acted corruptly.

The district court explained to the jury that the parties had stipulated to facts proving some of those elements:

Now, the parties have stipulated that the defendant was an agent of the City of Longwood and the Longwood Police Department. The City of Longwood and Longwood Police Department were governmental agencies during the period 2007 through 2011, and during that period

26

the City of Longwood and Longwood Police Department received in each of those years benefits greater than $10,000 under a federal program involving some form of federal assistance.

The district court continued its charge by instructing the jury on the intent required for the sixth element: "To act corruptly means to act voluntarily, deliberately and dishonestly to either accomplish an unlawful end or result or to use an unlawful method or means to accomplish an otherwise lawful end or result."  The district court also instructed the jury that it needed to find proof of these elements to convict Defendant Jackson of the substantive bribery offenses alleged in Counts Two through Four.

Defendant Jackson was not entitled to his proposed jury instruction on Florida law.[11]  This case is not about whether the Commission could or could not

_____

[11]Defendant Jackson included his proposed jury instruction on Florida law within his proposed instruction of the elements of § 666(a)(1)(B), which states in relevant part:

> Although Florida law generally prohibits an individual conviction of a felony offense from becoming a certified police officer, Florida law does not prohibit a convicted felon from becoming a certified police officer if he or she has received a pardon, clemency, or restoration of civil rights from the Governor of Florida.  A previously convicted felon is eligible to become a police officer in Florida if the Florida Governor grants him clemency through an Executive Order under Article IV, Section 4 of the Florida Constitution that includes a restoration of civil rights.
> In summary, the Florida Criminal Justice and Training Standards Commission, which is part of the Florida Department of Law Enforcement or FDLE, has the discretion to certify as a police officer a person who has had his civil rights restored following a prior felony conviction.  Although such a person is eligible to become a police officer, the FDLE may refuse to certify a person as a police officer if the FDLE determines that he is of bad character, a poor moral risk, or an otherwise unfit appointee.
> Additionally, a federal conviction is considered a felony conviction under Florida law for purposes of determining a person's eligibility to become a police

27

legally certify Majzoub as a police officer under Florida law.  Instead, the question is whether Jackson corruptly accepted bribes to be influenced or rewarded for appointing Majzoub as an LPD law enforcement officer, and the evidence—viewed in the light most favorable to the jury's verdict—demonstrates that he did so.

The district court's instruction correctly explained the corrupt-intent requirement based on our precedents and allowed the jury to determine whether the evidence demonstrated that Jackson acted corruptly.  Giving Jackson's proposed instruction on Florida law would have only served to confuse the jury about the requisite corrupt intent.  In other words, the legal technicality of whether the Commission could theoretically certify Majzoub had no bearing on whether Jackson aced for an illegal goal because Jackson illegally appointed Majzoub without the Commission's required certification.  The district court thus did not need to give Jackson's requested jury instruction.  See United States v. Schlei, 122 F.3d 944, 969 (11th Cir. 1997) ("If the instruction would not assist the jury in deciding the issues before it, the district court need not grant defendant's request.").

---

officer only if the federal crime would also be a felony offense under Florida state law.  A federal conviction for securities and mail fraud using the instrumentalities of interstate commerce is not a felony offense under Florida law.

28

Alternatively, we conclude that Defendant Jackson was not prejudiced by the district court's failure to give his requested instruction because the district court's instruction properly stated the law and because Jackson was given the opportunity to present evidence and argue the corrupt-intent issue at closing argument. See Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1235 (11th Cir. 2004). Indeed, Jackson's counsel used almost his entire closing argument to persuasively present the case that the evidence demonstrated Jackson lacked corrupt intent. The jury, however, rejected that defense.[12]

## IV.    CONCLUSION

Based on the foregoing reasons, we affirm Defendant Jackson's convictions for conspiracy and federal funds bribery under 18 U.S.C. §§ 371 and 666(a)(1)(B).

**AFFIRMED.**

---

[12]Defendant Jackson also appealed the denial of his motion to dismiss the indictment. Jackson sought to dismiss the indictment on the grounds that the government told the grand jury that Florida law prohibits a convicted felon from becoming a police officer. We review the denial of a motion to dismiss an indictment for abuse of discretion. United States v. McIlwain, 772 F.3d 688, 693 (11th Cir. 2014). That Florida-law question is largely irrelevant because Jackson appointed Majzoub without any certification. Jackson has shown no abuse of discretion as to this ruling.

Additionally, because the ultimate answer to the legal question of Majzoub's eligibility for certification was irrelevant, we affirm the district court's evidentiary rulings, which we also review for abuse of discretion. Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1248 (11th Cir. 2001). Jackson sought to question the FDLE's attorneys about their internal deliberations and conclusions on (1) whether federal law would prohibit Majzoub from carrying a firearm as a police officer and (2) whether Florida law completely barred Majzoub from becoming a police officer. The evidence Defendant Jackson sought to admit had no bearing on his good faith defense and was thus irrelevant under Federal Rule of Evidence 401. Fed. R. Evid. 401; see also United States v. Troya, 733 F.3d 1125, 1131 (11th Cir. 2013) ("The evidence must be probative of the proposition it is offered to prove.") (quoting United States v. Glasser, 773 F.2d 1553, 1559 n.4 (11th Cir. 1985)).